# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

JAMES E. REINER and DANA )
REINER, )
       Plaintiffs, )
      )
     v. )     Cause No.: 2:13-CV-352-PRC
      )
ANTHONY DANDURAND, TRAVIS )
THOMAS, and TOWN OF HEBRON, )
       Defendants. )

## OPINION AND ORDER

This matter is before the Court on Defendants' F.R.C.P. 12(b)(6) Motion to Dismiss [DE 6], filed on October 18, 2013.

### I. Procedural Background

On August 29, 2013, Plaintiffs James E. Reiner and Dana Reiner filed an eleven-count Complaint against Defendants Anthony Dandurand, Travis Thomas, and the Town of Hebron in the Porter County, Indiana, Superior Court, based on a January 30, 2012 traffic stop. The Complaint alleges federal claims against Officers Dandurand and Thomas for illegal seizure of person (Count I), excessive force (Count II), and false arrest (Count III), all in violation of the United States Constitution pursuant to 42 U.S.C. § 1983. Against Officers Dandurand and Thomas as well as against the Town of Hebron based on a theory respondeat superior liability, the Complaint alleges Indiana state law tort claims of assault (Count IV), battery (Count V), false arrest (Count VI), false imprisonment (Count VII), excessive use of force (Count VIII), malicious prosecution (Count IX), intentional infliction of emotional distress (Count X), and civil conspiracy (Count XI).

On September 30, 2013, Defendants removed this case to the United States District Court for the Northern District of Indiana. On October 18, 2013, they filed this Motion to Dismiss. This

matter became fully briefed on November 27, 2013, and the Court was advised on December 6, 2013, that the parties had filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. This Court thus has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c).

## II. Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the complaint and not the merits of the suit. *See Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In ruling on such a motion, the Court accepts as true all of the well-pleaded facts alleged by the plaintiffs and all reasonable inferences that can be drawn therefrom. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *see also Tamayo v. Blagojevich*, 526 F.3d 1074, 1082 (7th Cir. 2008).

To survive a 12(b)(6) motion to dismiss for failure to state a claim, the complaint must first comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Second, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570); *see also Tamayo*, 526 F.3d at 1082. The Supreme Court explained that the "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quotation marks and brackets omitted); *see also Iqbal*, 556 U.S. at 678–79; *Brooks v. Ross*, 578 F.3d

574, 581 (7th Cir. 2009). Determining whether a complaint states a plausible claim for relief requires the Court to draw on its judicial experience and common sense. *Iqbal*, 556 U.S. at 679.

### III. Plaintiff's Factual Allegations

The facts, as alleged by Plaintiffs, are as follows. Plaintiff Dana Reiner (Dana) went into labor shortly after midnight on January 31, 2012. She and her husband, Plaintiff James Reiner (James), got in their 1994 Lincoln Town Car at about 1:50 a.m. and left their Demotte, Indiana, home for St. Anthony's Hospital in Crown Point, Indiana, with James driving. They drove north along U.S. 231 and soon arrived at the intersection of U.S. 231 and S.R. 2. At the intersection, Plaintiffs saw a police officer in a marked squad car, facing east, pulled over behind another car. James stopped and drove carefully through the intersection, turning left onto S.R. 2. While he was going through the intersection he made eye contact with the officer.

After driving for about a mile, James noticed the officer perform a u-turn and start following them. Immediately after noticing this, James made a call to a 9-1-1 dispatcher to ask for a police escort to the hospital. They drove on with James obeying all applicable traffic laws. The squad car then pulled behind them and activated its flashing emergency lights. Dana was worried that, if they were pulled over, she might end up giving birth to their baby in a remote area, without the benefit of medical assistance. Instead of pulling over, James turned on his hazard blinkers and continued to drive. He remained on the phone with the 9-1-1 dispatcher, attempting to communicate to the police why he wasn't pulling over. After driving about a mile, he decided to get off the phone, pull over, explain things to the officer, and ask for an escort to the hospital.

James pulled over onto the right shoulder of S.R. 2. As soon as Plaintiffs' vehicle came to a stop, Dana saw laser-beam dots darting around the inside of their car. James saw the silhouette of

an officer approaching the car with his gun drawn. The Lincoln's driver-side window didn't work, so—with both hands raised—he opened the door and rolled out onto the pavement. As he got out, Dana told him to stop because, seeing the laser beams, she was afraid he would be shot. Neither James nor Dana could understand the officer (Defendant Officer Anthony Dandurand), since he had left his siren on. James yelled to Officer Dandurand that his wife was in labor and that he needed to get her to the hospital. Officer Dandurand—who was pointing his gun at James—yelled back: "I will shoot you, you piece of shit! Get on the ground!"

Officer Dandurand, still with gun drawn, approached James and put his knee on the back of James's neck, shoving his face onto the pavement. He handcuffed James, and—though James was physically submissive—yelled at him to "stop resisting, stop resisting."

Shortly after James was handcuffed, a second officer (Defendant Officer Travis Thomas) arrived, also with gun drawn. James continued to attempt to explain that his wife, who was still in the passenger seat, was in labor and needed to get to the hospital. He also explained that he had called a 9-1-1 dispatcher to ask for a police escort. Officer Dandurand replied: "You will be in jail tonight, and you will not be there when your child is born." Concerned that his car would run out of gas and that he wouldn't be able to drive Dana to the hospital, James asked the Officers if he could turn the motor off. Officer Dandurand responded, "It doesn't matter, that car is mine now!" James asked if he could get up off the pavement; Officer Dandurand refused.

Around the same time, Officer Thomas approached the passenger side of the car. Dana's contractions had grown closer together; she was screaming in pain and frightened for her own safety as well as the safety of her child and husband. Dana attempted to explain the situation to Officer Dandurand and Officer Thomas, but to no avail. Officer Thomas responded that James was going

to jail because "he didn't do what I told him!" Dana told the police that she had directed James not to stop because she was having a baby. This prompted Officer Thomas to respond that James "is a grown-ass man and can make his own decisions." Dana then got out of their vehicle to show that she was pregnant (her water had broken, and her pants were wet), asking that she be taken to the hospital. Officer Thomas then pointed his gun at Dana's stomach (Dana observed the dot of a laser beam on her abdomen) and yelled "I don't care, get back in the fucking car!" Afraid for both herself and her soon-to-be-born child, she got back in the car and waited. Meanwhile, James had been moved to the back seat of one of the squad cars.

At some point, Dana asked for James's cell phone, so she could call her mother. One of the officers eventually tossed her the phone, and she called her mother. When Dana asked for an officer to speak to her mother, Officer Thomas told her "you are a grown-ass woman. I am not going to talk with your mother."

Other officers soon arrived at the scene, but Dana could not identify which agencies they represented. Later, when she tried to get out of the vehicle, an officer (not one of the Defendants) stood in front of her door, barricading her in.

One of the officers asked Officer Dandurand whether he had tazed James. Officer Dandurand then turned to James and asked him, "Have you ever been tazed before?" James responded that he had not. Officer Dandurand then said "Do you want to get tazed? It's not too late!"

During this time, Dana's contractions had gone from two minutes apart to one minute apart. When asked by a Lowell Police Officer what this meant, Dana informed him that this "means I am having this baby right now. Are you going to take me to the hospital or not?" The Lowell Police Officer told her no, she would have to wait for an ambulance. Fifteen minutes after the stop began,

Officer Dandurand called for an ambulance, which arrived roughly seven minutes after the call was made.[1]

The police brought James over near Dana as she was being placed in the ambulance. She asked if she could kiss her husband before being taken away. She heard one of the officers or paramedics laugh, and she was told no, she couldn't.

The ambulance took Dana to St. Anthony's Hospital, and, within three minutes of arriving in the delivery room, Dana gave birth to her second child, a girl. The baby's umbilical cord had wrapped around the child's neck, and the OB/GYN physician had to untangle it to prevent the infant from choking to death. Had Dana given birth any sooner, the child likely would have suffocated.

Meanwhile, James was transported to the Porter County Jail where he was interviewed by a jail officer and learned that he had been charged by Officers Dandurand and Thomas with "resisting arrest by fleeing in a vehicle," a felony. During the arrest, he sustained minor injuries: a cut on his eyebrow and road rash on his cheek from being shoved into the pavement by Officer Dandurand. His wrists were swollen and his left thumb had gone numb from the over-tightened handcuffs. He spent the rest of the night in jail.

The next day, Dana's mother posted bond for James, and he was released. No criminal charges were filed against James. The $850 for the bond and a $25 booking fee have never been refunded. The Plaintiffs' Lincoln vehicle was impounded and James and Dana paid $155 to get it released. That money has never been refunded. And they were charged $145.40 for the ambulance

---

[1] Officer Dandurand's report of the incident explained that he had been advised immediately after pulling James over that Dana was in labor and needed an ambulance.

service, which they paid but has never been refunded. The total alleged un-reimbursed expenses paid by Plaintiffs are $581.60.

## IV. Analysis

Instead of responding to many of the arguments actually raised in Defendants' brief, Plaintiffs' brief goes on at length arguing that their Complaint meets the pleading requirements of the Federal Rules of Civil Procedure. Defendants do not contest this. Rather, Defendants allege that the Complaint's factual allegations do not provide any grounds for relief. The Court considers Defendants' arguments in turn.

### A. Federal Claims

#### *1. Qualified Immunity*

Defendants Dandurand and Thomas contend that they have qualified immunity from liability.

"[G]overnmental actors performing discretionary functions enjoy qualified immunity and are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *In re Escobedo v. Bender*, 600 F.3d 770, 778 (7th Cir. 2010) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982))).

In determining whether a state actor is shielded from liability by qualified immunity, a court must consider "whether, taking the facts in the light most favorable to the plaintiff, the officers' conduct violated a constitutional right," and "whether the particular constitutional right was 'clearly established,' at the time of the alleged violation." *Id*. (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Courts have discretion about which of the two inquiries to address first. *Id*. (citing *Pearson v. Callahan*, 555 U.S. 223 (2009)). A right is "clearly established" when there is either a closely

analogous case that establishes that the conduct is unconstitutional or when the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (citing *Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1022 (7th Cir. 2000)).

### *2. Illegal Seizure of Persons and False Arrest*

The Fourth Amendment, which was made applicable to the states by the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643 (1961), prohibits the government from executing unreasonable searches and seizures. U.S. Const. amend. IV; *California v. Hodari D.*, 499 U.S. 621, 624 (1991). The Fourth Amendment's protections apply to arrests as well as to brief investigatory stops of vehicles and people that fall short of traditional arrests. *Terry v. Ohio*, 392 U.S. 1, 9 (1968); *Harper v. State*, 922 N.E.2d 75, 79 (Ind. Ct. App. 2010). "[P]olice can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Warrantless arrests for a felony or a misdemeanor committed in an officer's presence, by contrast, are "consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003).

Defendants contend that the Complaint reveals that Officer Dandurand witnessed two violations of Indiana law and thus had a reasonable suspicion (indeed, probable cause) to support a traffic stop, thus bringing to naught Plaintiffs' claims of illegal seizure and false arrest. Defendants first contend that James violated Indiana's resisting-arrest statute, Indiana Code § 35-44.1-3-1, which provides that someone "who knowingly or intentionally . . . flees from a law enforcement officer

after the officer has, by visible or audible means, including operation of the law enforcement officer's siren or emergency lights, identified himself or herself and ordered the person to stop; [sic] commits resisting law enforcement, . . . [a] Class D felony if . . . the person uses a vehicle to commit the offense." Ind. Code § 35-44.1-3-1.

Likewise, Defendants contend that, by not immediately pulling over to the side of the road, James violated Indiana Code § 9-21-8-35, which provides that, when an emergency vehicle with its siren or lights on approaches, motorists must "immediately drive to a position parallel to and as close as possible to the right-hand edge or curb of the highway . . . . [and s]top and remain in the position until the authorized emergency vehicle has passed." Ind. Code § 9-21-8-35.

Plaintiffs assert that this is a bootstrapping argument: they contend that James was obeying all traffic laws when Officer Dandurand activated his emergency lights so the initial order to stop was accordingly not supported by probable cause or even reasonable suspicion. The question is whether disobeying an illegal order can serve as grounds for probable cause for violating Indiana's resisting arrest statute.

Defendants contend that this does not pose any problem, pointing to *Cole v. State*, which held that "an individual may not flee from a police officer who has ordered the person to stop, regardless of the apparent or ultimate lawfulness of the officer's order." 878 N.E.2d 882, 886 (Ind. Ct. App. 2007), *abrogated by Gaddie v. State*, 49S02-1312-CR-789, 2014 WL 2922379 (Ind. June 27, 2014) (internal citations and quotation marks omitted). Though *Cole* was good law at the time that Defendants filed their briefs, it—along with many similar cases—has been recently overturned by the Indiana Supreme Court in *Gaddie*, which reasoned that:

> To hold that a citizen may be criminally prosecuted for fleeing after being ordered to stop by a law enforcement officer lacking reasonable suspicion or probable cause to command such an involuntary detention would undermine longstanding search and seizure precedent that establishes the principle that an individual has a right to ignore police and go about his business.

*Gaddie*, 2014 WL 2922379, at *3.

The *Gaddie* Court concluded, even though the Resisting Law Enforcement statute does not condition its application on the lawfulness of an initial order to stop, such an interpretation would violate the Fourth Amendment. *Id.* at *4. Rather than invalidate the statute as unconstitutional, however, the court construed it to apply only to lawful orders to stop. *Id.*[2]

 But *Gaddie* was decided on June 27, 2014—years after this incident. At the time of the arrest, *Cole* and many other cases would have given a reasonable officer grounds to think that, regardless of whether the initial order to stop was lawful, failure to obey his order to stop created probable cause to stop the person for violating Indiana's Resisting Arrest statute and that the stop did not violate the Fourth Amendment. The right established by *Gaddie* was not clearly established at the time of the events in this case.

Even if this were not the case, Indiana law provides that motorists must pull to the side of the road and stop *regardless* of whether they are actually being stopped by the police. Ind. Code §

---

[2] The court, however, explained that its opinion "should not be understood to necessarily apply to other statutes related to police authority to impinge on individual conduct as part of their community caretaking function." *Gaddie v. State*, 49S02-1312-CR-789, 2014 WL 2922379, at *4 n.3 (Ind. June 27, 2014). This Court need not address this issue here, however, since, as explained in this section, *Gaddie* came too late to clearly establish for Officers Dandurand and Thomas that arresting someone for ignoring an unlawful order to stop violates the Fourth Amendment.

9-21-8-35. James did not do so; thus, the Officers' decision to pull James over for a traffic violation is also not a violation of a clearly established constitutional right.[3]

Defendants are therefore entitled to qualified immunity—and, accordingly, dismissal—for the decision to pull Plaintiffs over. Likewise, the Officers are entitled to qualified immunity for the decision to handcuff James and place him under arrest. *Cf. Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977).

But the Court does not think that a reasonable officer, after realizing (as Officers Dandurand and Thomas did soon after handcuffing James) that Plaintiffs were *en route* to the hospital to have their baby, would have continued to detain them, much less have kept James under arrest and taken him to jail for the night. To the contrary: such conduct, at that point, violates the clearly established guarantees of the Fourth Amendment.

In a similar § 1983 case involving a woman in labor who fled a traffic stop and was arrested as she struggled to get into the hospital emergency room, the Eleventh Circuit Court of Appeals explained that, while an arresting officer generally does not need to consider the validity of any possible affirmative defense, *Williams v. Sirmons*, 307 F. App'x 354, 358–59 (11th Cir. 2009) (citing *Baker v. McCollan,* 443 U.S. 137, 145–46 (1979)), an exception exists when the arresting officer knows the "facts and circumstances conclusively establishing an affirmative defense." *Id.*; *accord Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1061 (7th Cir. 2004) ("A police officer may not ignore conclusively established evidence of the existence of an affirmative defense . . . but the

---

[3] Plaintiffs' contention that James complied with this law by putting on his blinkers is incorrect: the law provides that motorists must pull over immediately. Ind. Code § 9-21-8-35. And it is also not a fair inference from the facts pled in Plaintiffs' Complaint that, as Plaintiffs contend in their brief, James could not find a safe place to pull over for 1.1 miles. He was driving on a state highway, at approximately 2:00 in the morning. The Complaint states that he decided not to pull over because of his wife's labor, not because he couldn't find a safe patch of shoulder to pull over onto.

officer has no duty to investigate the validity of any defense."); *Estate of Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir.1999). The *Williams* court concluded that, "if an officer has knowledge of facts and circumstances which establish an affirmative defense, he or she lacks probable cause to arrest, even when the facts and circumstances establish that the person meets all elements of the offense." *Williams*, 307 F. App'x at 358–59.

Here, Officers Dandurand and Thomas, from the point that they realized that Dana was in labor, should have been aware that James's actions were excused by the affirmative defense of necessity. In Indiana, the necessity defense can succeed when the following six factors are satisfied:

(1)     The act charged as criminal must have been done to prevent a significant evil;

(2)     There must have been no adequate alternative to the commission of the act;

(3)     The harm caused by the act must not be disproportionate to the harm avoided;

(4)     The accused must entertain a good faith belief that his act was necessary to prevent greater harm;

(5)     Such belief must be objectively reasonable under all the circumstances; and

(6)     The accused must not have substantially contributed to the creation of the emergency.

*Belton v. State*, 49A04-1310-CR-487, 2014 WL 1509208, at *1045–46 (Ind. Ct. App. Apr. 17, 2014) (citing *Toops v. State*, 643 N.E.2d 387, 389 (Ind. Ct. App. 1994) (explaining that, in Indiana, necessity, though not codified in the criminal code, is a common law defense)). James's actions meet all six requirements.

(1)     The evil he sought to avoid was his wife giving birth to their child without adequate medical care, which would have endangered the lives and health of both mother and child;

(2)     Stopping the car with his wife about to give birth—she, urging him not to stop for both her own and her baby's safety—was not a reasonable option, especially since he was convinced that the 9-1-1 dispatcher would be able to redirect the officer from trying to pull them over to escorting them to the hospital;

(3)     The harm caused (the violation of a lawful order to stop his car) is negligible and not disproportionate to the harms to his wife and child that he was seeking to avoid;

(4)     It is evident from the Complaint that he thought pulling over would put his wife and child in danger and thus he had a good faith belief that his actions were necessary to prevent greater harm;

(5)     This belief was objectively reasonable given the circumstances—it appeared that he would be able to get the 9-1-1 dispatcher to get him a police escort to the hospital and that, given the intensity of Dana's labor, stopping would put both her and their child at serious risk of injury;

(6)     The emergency was not of James's own creation.

Thus, as in *Williams*, James "was acting under necessity." *Williams*, 307 F. App'x at 359. His disobedience was "justified by the affirmative defense of necessity or duress." *Id.* For this reason, based on the Complaint, the Officers lacked arguable—much less actual—probable cause to arrest, even though James's conduct "met all elements of the offense of fleeing or eluding a police officer." *Id.*; *Hodgkins*, 355 F.3d at 1061.

The Court also concludes that this right was clearly established at the time of the offense. In the first place, as explained above, the applicable case law states that police officers may not ignore evidence that establishes an affirmative defense which defeats probable cause and reasonable

suspicion. *Hodgkins*, 355 F.3d at 1061; *cf. Williams*, 307 F. App'x at 359.[4] Even if the unconstitutionality of the alleged conduct was not clearly established through case law, the violation was so obvious "a reasonable state actor would know that his actions violated the Constitution." *Siebert*, 256 F.3d at 654. The likely reason why there are so few analogous cases (*Williams* is the only factually similar case this Court has found), is that police officers know better than to detain, arrest, and jail someone in these sorts of circumstances.

Accordingly, the Court dismisses in part Counts I and III of Plaintiffs' Complaint alleging illegal seizure of person and arrest, but only up to the point in time Defendant Officers knew that Dana was in labor and that James was taking her to the hospital.

### 3. Excessive Force

Claims of excessive force are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989). "A police officer's use of force is unconstitutional if, 'judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987)). "An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest." *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 395). The test, which is considered from the perspective of a reasonable officer at the scene, is objective—the officer's intentions, good or bad, are irrelevant.

---

[4] The Seventh Circuit Court of Appeals has held that out-of-circuit cases, such as the *Williams* case, can clearly establish constitutional rights. *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) ("But even if not reasonably obvious to Severino, a closely analogous case indicates that his conduct was unconstitutional: his search took place in 1996, and less than three years earlier the Fourth Circuit held that citizens enjoy an expectation of privacy in their barn." (citing *United States v. Wright*, 991 F.2d 1182, 1186 (4th Cir. 1993))).

*Graham*, 490 U.S. at 396. The nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Stainback*, 569 F.3d at 772 (citing *Graham*, 490 U.S. at 396).

Given the apparent danger of the situation—James had not pulled over when ordered to, had exited his car, and was yelling—the Court does not think the use of force, which caused only minor injuries, was excessive. *See Smith v. City of Chicago*, 242 F.3d 737, 744 (7th Cir. 2001); *Cf. Stainback*, 569 F.3d 767, 772 (7th Cir. 2009).

But these justifications evaporated as Defendant Officers realized that Plaintiffs had been going to the hospital because Dana was in labor. As discussed above, at this point—on the facts alleged—the detention of Plaintiffs became unlawful, and any further use or threat of force became objectively unreasonable. *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1043 (7th Cir. 2002).

> [W]hen an illegal arrest sets off a chain of indignities inflicted on the hapless victim, including offensive physical touchings that would be privileged if the arrest were lawful, [a Plaintiff] is entitled to obtain damages for these indignities whether or not they are independent violations of the Constitution. For they are foreseeable consequences of the illegal arrest, and the ordinary rules of tort causation apply to constitutional tort suits.

*Id.* at 1044. *Cf. Stainback*, 569 F.3d 767, 772 (7th Cir. 2009); *Williams v. Sirmons*, 307 F. App'x 354, 360 (11th Cir. 2009) ("If no probable cause authorizes an arrest, *any* use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment.").

### 4. Monell Liability

Though Plaintiffs do not assert any federal claims against the Town of Hebron, Defendants, in an abundance of caution, devote a section of their Motion to Dismiss to *Monell* liability. There is no *respondeat superior* liability under *Monell*; instead, municipalities are only liable "when execution of a government's policy or custom . . . inflicts the injury." *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). The Complaint makes no such allegations, and dismissal of any latent § 1983 liability against Defendant Town of Hebron is appropriate.

### 5. Right to be Present at the Birth of a Child

Defendants also point out, correctly, that there is no clearly established right to be present at the birth of one's child. *Fitzgerald v. Porter Mem'l Hosp.*, 523 F.2d 716, 721 (7th Cir. 1975) ("We hold that the so-called right of marital privacy does not include the right of either spouse to have the husband present in the delivery room of a public hospital which, for medical reasons, has adopted a rule requiring his exclusion."). Thus, to the extent that Plaintiffs' claim that Defendants violated a constitutional right to have James present at the birth of their daughter, that claim must be dismissed.

### 6. Section 1983 Damages

Defendants also contend that Plaintiffs wholly failed to place a monetary value on the constitutional rights they allege Defendants violated, contending that the monetary damages they allege apply only to Plaintiffs' state law claims. First, this is not true. The section on damages re-alleges all the allegations stated beforehand, including the descriptions of the monetary loss detailed in paragraph sixty-six of the Complaint.

Second, though Federal Rule of Civil Procedure 8(a)(3) "requires that a complaint contain a 'demand for judgment for the relief the pleader seeks,' the demand is not itself a part of the plaintiff's claim." *Bontkowski v. Smith*, 305 F.3d 757, 762 (7th Cir. 2002) (quoting Fed. R. Civ. P. 8(a)(3)). Thus, "failure to specify relief to which the plaintiff was entitled would not warrant dismissal under Rule 12(b)(6)." *Id.*

Even when a deprivation of constitutional rights didn't cause an actual, provable injury, nominal damages remain as an appropriate means of vindication. *Kyle v. Patterson*, 196 F.3d 695, 697 (7th Cir. 1999); *see also Redding v. Fairman*, 717 F.2d 1105, 1119 (7th Cir. 2007) ("Nominal damages are not compensation for loss or injury, but rather recognition of a violation of rights.").

### B. State Law Claims

In addition to their § 1983 claims, Plaintiffs also allege Indiana state law tort claims of assault, battery, false arrest, false imprisonment, excessive use of force, malicious prosecution, intentional infliction of emotional distress, and civil conspiracy. The Court first considers Defendants' contention that—aside from false arrest, false imprisonment, and civil conspiracy—each of these claims is barred by the immunity provisions of the Indiana Tort Claims Act (ITCA). Ind. Code § 34-13-3-3.

### 1. Immunity under the ITCA

In order for ITCA immunity to apply to employees such as Officers Dandurand and Thomas, the employee must be acting within the scope of his employment. *Id.* Plaintiffs' Complaint contends at times that Defendant Officers were acting within their scope of employment, thus allowing Plaintiffs to allege *respondeat superior* liability against Defendant Town of Hebron. At other times, they contend that the Officers were acting outside the scope of their employment, allowing Plaintiffs

to avoid the hurdle of ITCA immunity. Though pleading in the alternative is permissible, Fed. R. Civ. P. 8(d), the facts alleged establish that Officers Dandurand and Thomas were acting well within the scope of their employment.

If an alleged action is within the "general scope" of an individual's authority, "it is 'authorized' within the meaning of the Tort Claims Act, regardless of whether it was done negligently or with improper motive." *Marten v. Swain*, 1:12-CV-00195-TWP, 2013 WL 3155487, at *3 (S.D. Ind. June 20, 2013) (quoting *Butt v. McEvoy*, 669 N.E.2d 1015, 1018 (Ind. Ct. App. 1996)). The actions of pulling someone over, arresting him, etc. are within the general scope of a police officer's authority under the law. Indiana law does not place a "jurisdictional limitation on the authority of law enforcement officers, including city police officers, to detain or stop individuals for committing infractions." *Lashley v. State*, 745 N.E.2d 254, 258 (Ind. Ct. App. 2001) (citing *State v. Russ*, 480 N.E.2d 248, 250 (Ind. Ct. App. 1985)), *abrogated on other grounds by Gaddie*, 2014 WL 2922379, at *2. The Officers were acting within the scope of their employment.

"Under the law enforcement immunity provision of the Indiana Tort Claims Act, a governmental employee 'acting within the scope of the employee's employment is not liable if a loss results from . . . [t]he adoption and enforcement of . . . a law . . . *unless the act of enforcement constitutes false arrest or false imprisonment*." *Chapman v. Indiana*, 3:13CV730-PPS/CAN, 2014 WL 1831161, at *4 (N.D. Ind. May 8, 2014) (emphasis added) (quoting Ind. Code § 34-13-3-3(8)). Additionally, under the ITCA, a governmental entity and an employee acting within the scope of the employee's employment are immune from liability for the "initiation of a judicial or an administrative proceeding." Ind. Code § 34-13-3-3(6); *see also Livingston v. Consol. City of Indianapolis*, 398 N.E. 2d 1302 (Ind. Ct. App. 1979); *Norris by Norris v. Bd. of Educ. of Greenwood*

*Cmty. Sch. Corp.*, 797 F. Supp. 1452, 1461 (S.D. Ind. 1992) ("Indiana allows liability for some kinds of torts, but has expressly excluded liability for the tort of malicious prosecution.").

The Indiana Supreme Court has recognized additional exceptions to ITCA immunity "where other statutes impose affirmative obligations or limitations on law enforcement." *Ashcraft v. City of Crown Point, Ind.*, 2:13-CV-080 JD, 2013 WL 5934612, at *6 (N.D. Ind. Nov. 5, 2013) (citing *Wilson v. Isaccs*, 929 N.E.2d 200, 204 (Ind. 2010)). For example, immunity does not apply to claims of assault, battery, and excessive force. *Wilson*, 929 N.E.2d at 203 ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery."); *Chapman*, 2014 WL 1831161, at *4. "But 'add on' claims such as negligence and intentional infliction of emotional distress do not survive simply because they are a product of improper conduct." *Chapman*, 2014 WL 1831161, at *4 (internal quotation marks omitted); *Ashcraft*, 2013 WL 5934612, at * 6. Defendants are therefore only immune from suit for the claims of malicious prosecution and intentional infliction of emotional distress. Because Defendants cannot be sued for these violations, the Court dismisses these two claims in Counts IX and X.

As a result of the dismissal of the claim of intentional infliction of emotional distress, the civil conspiracy claim must be dismissed. "[C]ivil conspiracy is not an independent cause of action." *Heyser v. Noble Roman's Inc.*, 933 N.E.2d 16, 20 (Ind. Ct. App. 2010) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1234 (Ind. 1994)). Instead, it must be alleged with an underlying tort. Here, Plaintiffs allege that the underlying tort is intentional infliction of emotional distress for the actions Officers Thomas and Dandurand took in filing the report. Because Defendants are immune from suit for intentional infliction of emotional distress, the Court dismisses the civil conspiracy claim in Count XI.

### 2. ITCA Pleading Requirements

When a government employee is not protected by immunity, the ITCA provides in relevant part that there must be an allegation, supported by a reasonable factual basis, of an "act or omission of the employee" that is either criminal, malicious, or willful and wanton. Ind. Code § 34-13-3-5; *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1103 (S.D. Ind. 2008).

"Willful or wanton misconduct consists of either: '1) an intentional act done with reckless disregard of the natural and probable consequence of injury to a known person under the circumstances known to the actor at the time; or 2) an omission or failure to act when the actor has actual knowledge of the natural and probable consequence of injury and his opportunity to avoid the risk.'" *Ellis v. City of Martinsville*, 940 N.E.2d 1197, 1204–05 (Ind. Ct. App. 2011) (quoting *U.S. Auto Club, Inc. v. Smith*, 717 N.E.2d 919, 924 (Ind. Ct. App. 1999)).

Plaintiffs have satisfied this burden on their remaining state law claims. The facts alleged in the Complaint are that Defendant Officers intentionally disregarded the high likelihood of injury to Dana and her unborn child in detaining and threatening the couple and in delaying calling for an ambulance. As with § 1983 liability however, the intentional act done with reckless disregard did not begin until the officers knew that Dana was in labor and had been on her way to the hospital. The Court thus dismisses in part Plaintiffs' remaining state law claims of assault, battery, false arrest, false imprisonment, and excessive force (Counts IV-VIII) only to the extent Plaintiffs seek to recover damages for Defendants' actions *before* the Officers realized that Dana was in labor.

### 3. Assault, Battery, False Arrest, False Imprisonment, and Excessive Force

In light of what has been previously discussed, Plaintiffs' remaining claims of assault, battery, false arrest, false imprisonment, and excessive force can proceed. On the facts alleged,

Plaintiffs were illegally detained and James was illegally arrested and jailed. The Complaint also alleges that Defendants used illegal, and thus excessive, force (e.g. the handcuffing) as well as the threat of force (e.g. pointing of the gun at Dana's belly and Officer Dandurand's threat to taze James). This is enough to establish colorable claims of assault, battery, and excessive force. Dismissal of these claims is accordingly not warranted. *Wilson v. Isaacs*, 929 N.E.2d at 203 ("If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery.").

### C. Punitive Damages

Defendants also contend that Plaintiffs cannot recover punitive damages under either § 1983 or on their Indiana state law claims. The Court considers each in turn.

### *1. Section 1983*

A "jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). But this does not apply to municipalities, which are immune from punitive damages unless otherwise allowed by statute. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981). As discussed below, Indiana law does not allow punitive damages against governmental entities. *See* Ind. Code § 34-13-3-4; *Kelley v. City of Michigan City*, 300 F. Supp. 2d 682, 690 (N.D. Ind. 2004).

Defendants further contend that punitive damages under § 1983 are unavailable against Defendant Officers because of the subjective reasonableness of their actions. This is essentially a rehash of the substantive arguments made above. Accordingly, insofar as Plaintiffs' § 1983 claims

were dismissed, punitive damages against the Officers are, of course, not available. But insofar as they proceed past dismissal, they are permitted.

### 2. State Law Claims

Indiana law provides that a "governmental entity or an employee of a governmental entity acting within the scope of employment is not liable for punitive damages" Ind. Code § 34-13-3-4. As discussed above, Defendant Town of Hebron is thus immune from punitive damages. Likewise, Defendant Officers were also at all relevant times acting within the scope of their employment and were thus immune from punitive damages. Accordingly, Plaintiffs' claim for state law punitive damages must be dismissed.

## V. Conclusion

For these reasons, the Court **GRANTS in part** and **DENIES in part** Defendants' F.R.C.P. 12(b)(6) Motion to Dismiss [DE 6].

Plaintiffs' federal law § 1983 claims in Count I (illegal seizure of person), Count II (excessive force), and Count III (false arrest) and Indiana state law claims in Count IV (assault), Count V (battery), Count VI (false arrest), Count VII (false imprisonment) and Count VIII (excessive force) are **DISMISSED** to the extent they allege wrongdoing *before* the Officers knew Dana was in labor, but these claims survive and **REMAIN PENDING** to the extent they allege wrongdoing *after* the Officers learned Dana was in labor.

Plaintiffs' Indiana state law claims in Count IX (malicious prosecution), Count X (intentional infliction of emotional distress), and Count XI (conspiracy) are **DISMISSED**.

To the extent that Plaintiffs claim that Defendant Town of Hebron is liable on the § 1983 claims in Counts I, II, and III under the *Monell* doctrine or that Defendants violated an alleged right of James to be present at the birth of his child, any such claims are **DISMISSED**.

Plaintiffs' prayer for an award of punitive damages against Defendant Town of Hebron is **DISMISSED**. Plaintiffs' prayer for an award of punitive damages against Defendant Officers Dandurand and Thomas on the Indiana state law claims is **DISMISSED**. Plaintiff's prayer for an award of punitive damages against Defendant Officers Dandurand and Thomas on the § 1983 claims is **DISMISSED** *only* to the extent that those § 1983 claims have been dismissed.

SO ORDERED this 15th day of July, 2014.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record